# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOHN LYND, individually and on behalf of all others similarly situated, | Case No. _1:16-cv-984 (BKS/DJS)_ |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| | **JURY TRIAL DEMANDED** |
| v. | |
| FCA US LLC, | |
| Defendant. | |

Plaintiff John Lynd, on behalf of himself and all others similarly situated, by and through

his undersigned attorneys, Finkelstein, Blankinship, Frei-Pearson & Garber, LLP, as and for his

class action complaint, alleges, based on personal knowledge as to his own actions and upon

information and belief and investigation of counsel as to those of others, as follows:

## NATURE OF THE ACTION

1.    Plaintiff brings this class action against Defendant FCA US LLC ("FCA") to

obtain redress for its deceptive representations and omissions regarding its use of the dangerous

and defectively designed monostable electronic gearshift system supplied by ZF Friedrichshaffen

AG (the "ZF Shifter").  FCA installed more than 800,000 ZF Shifters in FCA vehicles (the

"Class Vehicles").

2.    Plaintiff brings this action on behalf of a nationwide Class and a New York

Subclass of all similarly situated persons who purchased or leased a Class Vehicle equipped with

the ZF Shifter.

3.    The ZF Shifter fails to consistently shift the transmission into the gear desired by

the driver, thereby causing increased risk of accident and injury.  For example, the ZF Shifter can

cause a driver to reasonably believe that the transmission has been shifted to Park, even though it

has not, thereby causing the car to roll away in an uncontrolled or unexpected manner when the driver releases the brake pedal. This dangerous situation is further exacerbated when a driver fully exits the vehicle. The ZF Shifter can also prevent a driver from effectively shifting between gears, such as from Drive to Reverse and back again, making certain maneuvers, such as a three-point turn, unexpectedly dangerous to perform.

4.      FCA has misled consumers regarding the safety of the Class Vehicles. The uniform misrepresentations and omissions relating to the Class Vehicles' safety stem from Defendant's touting the safety of the Class Vehicles while failing to inform Plaintiff and the members of the Classes that the ZF Shifter presented a significant risk of accident. Even though FCA knew as early as December 2013 that the ZF Shifter was defective and presented a common safety risk to all the Class Vehicles, FCA concealed the danger inherent in the ZF Shifter until April 2016, when FCA finally issued a recall notice for the Class Vehicles.

5.      Defendant's misrepresentations and omissions regarding the Class Vehicles' safety were a material factor in inducing Plaintiff and members of the Classes to purchase and lease the Class Vehicles. As a result of Defendant's misleading and deceptive conduct, Plaintiff and the members of the Classes purchased or leased a vehicle that posed a significantly greater risk of accident than expected. Moreover, FCA has failed to provide an adequate repair for the ZF Shifter in a timely manner, endangering the property and persons of drivers, passengers, and bystanders of the Class Vehicles.

6.      Accordingly, Plaintiff, on behalf of himself and all other similarly situated, asserts six causes of action against FCA for its wrongful behavior, including breach of express and implied warranties, violation of New York General Business Law ("GBL") §§ 349 and 350, and

unjust enrichment, and seeks restitution, damages, and equitable relief, including disgorgement of profits, and appropriate attorney's fees and costs and any other relief the Court deems just.

### JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d), as minimal diversity exists, there are more than 100 class members, and the amount in controversy is in excess of $5 million.  This Court also has supplemental jurisdiction over the state law claims pursuant to 32 U.S.C. § 1367.

8.      This Court has personal jurisdiction over the parties because Defendant conducts substantial business in this State, has had systematic and continuous contacts with this State, and has agents and representatives that can be found in this State.

9.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391, because Defendant's contacts are sufficient to subject it to personal jurisdiction in this District and a substantial part of the events and omissions giving rise to the claims occurred in this District.  Defendant has marketed, advertised, sold, and leased the Class Vehicles in this District.  Furthermore, Plaintiff resides within this District and purchased his Class Vehicle containing the ZF Shifter within this District.

### PARTIES

**I.      Plaintiff**

10.      Plaintiff John Lynd is an individual and citizen of New York State residing in Albany, New York.  Mr. Lynd is a member of the Classes, as defined below.  On or about November 30, 2014, Mr. Lynd leased a brand-new 2015 Jeep Grand Cherokee from Goldstein Chrysler Jeep Dodge Ram in Latham, New York.

11.      Plaintiff leased the vehicle because of its reputation for safety and reliability, consistent with his exposure to marketing materials for the vehicle.  Plaintiff has a family and

wanted a car that was safe to drive and did not present a risk of breaking down or getting in accidents. Prior to leasing the vehicle, Plaintiff test drove it and reviewed specific features and options available. Based on Defendant's representations regarding the vehicle, Mr. Lynd believed that the vehicle was safe and reliable and, therefore, a good value. Mr. Lynd's lease has not expired.

12.    Unbeknownst to Mr. Lynd at the time he leased the vehicle, the vehicle contained the defectively designed ZF Shifter.

13.    FCA knew that the ZF Shifter presented various safety risks but failed to disclose the defect and its attendant safety risk to Mr. Lynd prior to his leasing the vehicle.

14.    Because of the defective ZF Shifter, Mr. Lynd has experienced multiple instances where he was about to exit or had exited the vehicle, assuming the transmission had been placed in Park, only to discover that the transmission was actually in Drive or Reverse.

15.    Not until FCA's May 14, 2016, recall letter, wherein FCA admitted that the ZF Shifter presented a risk that the vehicle would roll away and cause injury, did FCA inform Mr. Lynd that his vehicle's gear shifting mechanism was defective and presented an inherent safety risk.

16.    On or about June 20, 2016, Mr. Lynd learned that Anton Yelchin had been crushed to death by a rollaway 2015 Jeep Grand Cherokee, apparently as a result of the same defective ZF Shifter. Shortly thereafter, Mr. Lynd contacted the FCA dealer from whom he had leased his vehicle to inquire as to the availability of a fix for the problem.

17.    Upon contacting the dealer, Mr. Lynd was informed that FCA had provided dealers with a supposed fix for the safety issues presented by the defective ZF Shifter installed in Mr. Lynd's Jeep Grand Cherokee in the form of a software patch.

18.     Later that week, Mr. Lynd took his vehicle to the dealer, who installed the software patch provided by FCA.

19.     The software patch has proven ineffective.  On more than one occasion, Mr. Lynd has used the presumably fixed ZF Shifter to place the vehicle into Park, only to watch the transmission shift instead into a different gear.

20.     After receiving the software patch and continuing to suffer safety risks due to the defective ZF Shifter, Mr. Lynd notified the dealer that the software patch has not remedied all the safety issues caused by the ZF Shifter.  The dealer informed Mr. Lynd that FCA did not offer any additional remedial measures to resolve the safety issues associated with the ZF Shifter.

21.     Mr. Lynd no longer feels safe driving the vehicle and will not allow other members of his family to operate it.

22.     As a result of FCA's unfair and deceptive conduct; breach of contractual, common law, and statutory duties; and omissions and/or misrepresentations associated with the ZF Shifter and its associated safety risks, Mr. Lynd has suffered concrete injury, including but not limited to, out-of-pocket losses and the diminished value of his vehicle.

**II.     Defendant**

23.     Defendant FCA US LLC ("FCA") is a for-profit limited liability company organized under the laws of Delaware and maintains its headquarters and principal place of business at 1000 Chrysler Drive, Auburn Hills, Michigan.  FCA is wholly owned by Fiat Chrysler Automobiles N.V., a Dutch corporation headquartered in London, England.

24.     FCA designs, engineers, manufactures, and sells vehicles under the Chrysler, Jeep, Dodge, Ram, and Fiat brands, among others.  FCA distributes and sells its motor vehicles and parts through a network of authorized motor vehicle dealers located in every state of the

United States.  FCA engages in interstate commerce by selling vehicles through this network, including within the Northern District of New York.

25.     FCA and/or its affiliates and agents designed, manufactured, and/or installed the ZF Shifter in the Class Vehicles.

26.     FCA and/or its affiliates and agents distributed, sold, leased, and warranted the Class Vehicles throughout the United States.

27.     FCA and/or its affiliates and agents developed and disseminated the owner's manuals, warranty booklets, advertisements, and other promotional materials relating to the Class Vehicles.

## FACTUAL BACKGROUND

### I.     FCA Begins Producing Vehicles Containing A Defective Gear Shifting System.

28.     In or about February 2011, FCA began producing certain models of its vehicles with an electronic gear-shifting system controlled by a monostable gear shifter (the "ZF Shifter").[1]  The FCA models containing the ZF Shifter (the "Class Vehicles") included the 2012-2014 Chrysler 300, 2012-2014 Dodge Charger, and 2014-2015 Jeep Grand Cherokee.

29.     Unlike more conventional gear shift systems, which mechanically connect the gear shifter to the transmission, electronic gear-shifting systems use electronic signals to transmit the gear requested by the driver from the gear shifter to a control module in the transmission which makes the requested gear shift take place.

30.     Because electronic shifter systems are not beholden to the physical requirements of a mechanically-linked shifting system, electronic shifter systems can use a wider variety of

---

[1] The gear shift system was supplied to FCA by ZF Friedrichshaffen AG.

gear selection interfaces to shift the transmission into the desired gear, including polystable shifters and monostable shifters.

31.     Polystable shifters require drivers to push or pull the shifter into predetermined physical positions for each gear -- Park, Reverse, Neutral, or Drive ("PRND") -- and then stay in that position, similar to a standard mechanical shifter, providing drivers with the expected tactile and visual feedback.  With a polystable shifter, in addition to the illumination of the gear position letter of the control console, a driver can also feel the difference in position of the gear shifting lever, as well as visually confirm the physical position of the shifter.  Below is an example of a polystable shifter, installed by FCA in the 2016 Jeep Grand Cherokee:



32.     In contrast, a monostable shifter has a single central position that it snaps back to when the driver releases the shift knob.  To shift gears, the driver depresses a button on the shift-

lever and pushes the lever forward or backward to cycle through PRND.  After finishing pushing the lever the number of times needed to reach the desired gear, the driver releases the shift lever and it returns to the central position where it remains until another gear shift is desired.

33.    The ZF Shifter installed by FCA in the Class Vehicles, including Plaintiff's 2015 Jeep Grand Cherokee, uses a monostable-style shifter.  Accordingly, the ZF Shifter does not move into a predetermined physical location for each gear, but springs back to a centered position after the driver selects a gear position and releases the shifter.  A button on the shift knob must be depressed to shift out of Park, shift out of Neutral, and to shift from Drive to Reverse or to Park.

34.    An example of the ZF Shifter installed by FCA in the 2014-2015 Jeep Grand Cherokee is below:



35. As described in FCA's manual for the 2015 Jeep Grand Cherokee, "[t]o select a gear range, press the lock button on the shift lever and move the lever rearward or forward." Furthermore, "[t]o shift past multiple gear ranges at once (such as PARK to DRIVE), move the lever past the first (or second) detent."

36. The term "detent" refers to subtle stopping points that feel like notches as the lever is pushed up or down from its centered, resting position. For example, a driver pushing the shifting lever up from the centered, resting position while the car is in Drive will presumably feel first one, then two, brief stops through which the driver is to push the lever in order to select a gear position past the one immediately adjacent to the position from which the driver is shifting. These brief stops presumably indicate that the lever has been used to select a gear position one, two, or three positions "above" or "below" the current gear. However, there is noticeably more travel when pushing the lever up than when pushing it down, making the interval between the "detents" non-uniform.

37. The ZF Shifter is defectively designed. As noted by the NHTSA in the closing report to an engineering investigation of the ZF Shifter:

> Although the Monostable gearshift has the familiar appearance of a conventional console mechanical gearshift assembly, it has an unfamiliar movement that does not provide the tactile or visual feedback that drivers are accustomed to receiving from conventional shifters. Consequently, the driver must take additional time to verify that the desired gear position was achieved by checking the PRNDL display on the shift knob or the Electronic Vehicle Information Center (EVIC) display.

38. This design failure creates an inherently dangerous situation. As the NHTSA further noted in its closing report:

> Field data indicate that the [monostable gearshift] design result[s] in higher error rates during attempted shifts to Park and higher rates of powered rollaway incidents. The Monostable design appears to violate several basic design guidelines for vehicle

controls, such as: 1) be consistent; 2) controls and displays should
function the way people expect them to function; 3) minimize what
the user has to remember; and 4) operations that occur most often
or have the greatest impact on driving safety should be the easiest
to perform.

39.    Indeed, in its April 22, 2014 recall notice, FCA admits that the ZF Shifter is

defective, stating that, because of the ZF Shifter, a driver can erroneously conclude that a

vehicle's transmission is in the Park position, when, in fact, it is not.

40.    The ZF Shifter, by failing to shift the transmission into the gear expected by the

driver, creates an unsafe environment.  A driver, assuming the car has been placed in Park, may

direct attention to something other than controlling the vehicle's movement.  Indeed, a driver

may release the brake pedal, exacerbating the already dangerous situation.  Because of the ZF

Shifter, the vehicle in such situations has an increased chance of rolling away in an uncontrolled

or unexpected manner, threatening injury to persons and property.

41.    In addition, a ZF Shifter that has not been subject to the software patch issued by

FCA does not have a safety-override or failsafe that prevents roll-away accidents due to a driver

exiting the car while it is not in Park.  Such an omission is particularly troubling because the

Class Vehicles' transmissions are designed to shift into Neutral if a driver attempts to shift into

Park while the vehicle is moving faster than 1.2 mph and their engines are designed to stay on

when a driver attempts to shut off the engine while the vehicle is not in Park.  As a result, a

driver can believe that the car has been shifted into Park, but, because the car had not come to a

complete stop, actually leave the car in Neutral, in which gear the driver may not realize the car's

power button is ineffective.  When the power button is pressed, and the driver exits the vehicle,

the engine remains on and the car's transmission is not in Park, creating a threat of roll-away

accidents.

42.     The ZF Shifter can also prevent a driver from effectively shifting between gears, such as from Drive to Reverse and back again, making certain maneuvers, such as a three-point turn, unexpectedly dangerous to perform.  Because the ZF Shifter does not effectively switch to the gear desired by the driver, it can cause the driver to take longer than reasonably expected to change from one gear position to another.  In at least one incident, reported to the NHTSA on June 27, 2016, a driver was unable to effectively transition between Drive and Reverse while attempting a three-point turn (also known as a K-turn), causing the driver to remain exposed to oncoming traffic for longer than expected and creating a dangerous situation that was, in that instance, narrowly avoided.

43.     Reasonable consumers expect to purchase a vehicle with a gear shift system that shifts into and remains in the gear position selected by the driver and does not present an unreasonable risk of accidents that could lead to injury and death.  FCA, by installing the ZF Shifter in the Class Vehicles, failed this expectation.

**II.     FCA Is Put On Notice Of The Defect And Safety Risks.**

44.     Defendant was aware (or should have been aware) that the ZF Shifter was defective based on, *inter alia*, pre-production testing, pre-production design failure mode analysis, production design failure mode analysis, early consumer complaints made to the NHTSA and FCA's network of dealers, fundamental design guidelines, and testing performed in response to consumer complaints.

**A.     The NHTSA Receives Numerous Complaints
From Consumers Regarding The ZF Shifter In The Class Vehicles.**

45.     Shortly after the Class Vehicles containing the ZF Shifter entered the market, FCA began receiving negative consumer feedback regarding the monostable ZF Shifter.

46.     One source of consumer feedback was the steady stream of complaints (now numbering in the hundreds) that were filed with the NHTSA by consumers who had purchased or leased a Class Vehicle and experienced a rollaway incident, collision, or other injury attributable to the ZF Shifter.  At all relevant times, FCA either was or should have been regularly monitoring NHTSA complaints.

47.     As demonstrated by the selection of complaints below, at least as early as December 2013, consumers had begun filing complaints that clearly describe a pattern of failed gear selection stemming from the ZF Shifter that manifested itself shortly after the vehicles entered the market and continued year after year.  The complaints describe numerous incidents where drivers had difficulty shifting the vehicle to the desired gear, resulting in, *inter alia*, uncontrolled and unexpected vehicle rollaways (whether or not a driver has exited the vehicle) or an inability to execute maneuvers (such as a three-point turn) that require rapid shifting from one gear position to another.  Below are a small selection of representative complaints (reproduced verbatim) of the hundreds of complaints filed with the NHTSA by owners and lessees of Class Vehicles.

> Date Complaint Filed: 03/06/2014; Date of Incident: 11/01/2013
> Year/Make/Model: 2014 Jeep Grand Cherokee
> Summary: PARKING VEHICLE AND PUTTING INTO PARK. EXITED THE VEHICLE AND CAR STARTED MOVING. SHIFTER WAS NOT IN PARK. VERY FUSSY SHIFTER. YOU CAN NOT TELL IT'S IN PARK UNLESS YOU LOOK EACH TIME. EVEN THOUGH YOU PUSH IT ALL THE WAY UP SOMETIMES IT IS NOT IN PARK. I HAD THE CAR START ROLLING SEVERAL TIMES AFTER EXITING THE CAR.

> Date Complaint Filed: 09/05/2014; Date of Incident: 09/27/2013
> Year/Make/Model: 2014 Jeep Grand Cherokee
> Summary: I HAVE HAD THIS SUV FOR ALMOST ONE YEAR. ON MULTIPLY INSTANCES I HAVE THOUGHT TO HAVE PUT THIS TRUCK IN PARK, BUT IT HAS EITHER GONE INTO NEUTRAL OR REVERSE. IT COMES WITH AN ELECTRONIC SHIFTER. BECAUSE IT IS ELECTRONIC IT

HAS THE SAME POSITION IN ANY AND ALL OF THE FOUR DESIRED GEARS. FURTHER COMPLICATING THE PROCESS OF MAKING SURE THE TRUCK IS IN THE DESIRED GEAR IS THAT THE ONLY WAY TO TELL WHAT GEAR YOU ARE IN IS BY AN ILLUMINATED SHIFTER WITH LETTERS P R N D/S ... WHEN IT VERY SUNNY OR YOU HAVE THE SUNROOF SHADE OPEN IT IS EVEN MORE DIFFICULT. HAVING THE SUNROOF OPEN ON A SUNNY DAY(DIFFERENT THAN JUST THE SHADE OPEN) IT IS ALMOST IMPOSSIBLE!! I BELIEVE SOMETHING TRAGIC WILL OCCUR EVENTUALLY IF THIS NOT CORRECTED. IT WONT WITH ME BECAUSE I AM VERY AWARE OF THE SITUATION. BUT SOMEONE SOMEWHERE WILL NOT BE AS AWARE OF IT AS I AM! I HAVE THE SAME TRUCK IN 2009 AND IT DOES NOT OPERATE IN THAT METHOD. I DO NOT KNOW HOW MANY OTHER VEHICLES OPERATE MANNER BUT I WILL NOT BE BUYING ANOTHER ONE AND THOUGHT OTHERS DESERVED THIS INFORMATION.

Date Complaint Filed: 03/23/2016; Date of Incident: 02/15/2016
Year/Make/Model: 2015 Jeep Grand Cherokee
Summary: TL* THE CONTACT OWNS A 2015 JEEP GRAND CHEROKEE. WHILE THE VEHICLE WAS IDLING AT A DRIVE-THRU, THE TRANSMISSION WAS SHIFTED INTO PARK. ONCE THE BRAKE PEDAL WAS RELEASED, THE VEHICLE LUNGED FORWARD. AS A RESULT, THE CONTACT'S VEHICLE CRASHED INTO THE REAR OF ANOTHER VEHICLE. A POLICE REPORT WAS FILED AND NO INJURIES WERE SUSTAINED. THE VEHICLE WAS TOWED TO THE DEALER. THE TECHNICIAN DIAGNOSED THAT THE TRANSMISSION NEEDED TO BE REPROGRAMMED. THE MANUFACTURER WAS MADE AWARE OF THE FAILURE. THE VEHICLE WAS NOT REPAIRED. THE FAILURE MILEAGE WAS 1,600. UPDATED 05/18/16*LJ

Date Complaint Filed: 04/11/2016; Date of Incident: 04/11/2016
Year/Make/Model: 2015 Jeep Grand Cherokee
Summary: INTENDING TO BACK INTO MY DRIVEWAY, I SHIFTED INTO REVERSE. THE VEHICLE WAS NOT IN REVERSE AND CRASHED INTO THE VEHICLE THAT WAS PARKED ON THE CITY STREET ACROSS THE STREET DIRECTLY ACROSS FROM MY DRIVEWAY.

Date Complaint Filed: 06/27/2016; Date of Incident: 06/02/2016
Year/Make/Model: 2015 Jeep Grand Cherokee

Summary: AUTOMATIC TRANSMISSION GEAR SELECTOR IS CONFUSING AND SLOW. SEVERAL TIMES WHEN MAKING A "K" U TURN WHICH REQUIRES QUICKLY SELECTING AND SHIFTING BETWEEN DRIVE AND REVERSE, I WAS MISTAKENLY IN NEUTRAL AND THE TIME DELAY CAUSED MY CAR TO BE SITTING IN TRAFFIC FOR TOO LONG A PERIOD WHILE I FUSSED WITH THE SHIFTER TO GET THE CAR INTO THE PROPER GEAR IN ORDER TO MOVE. CARS WERE FAST APPROACHING BUT NARROWLY AVOIDED A COLLISION.

**B.**    **FCA Stops Installing The ZF Shifter In Class Vehicles.**

48.    FCA's awareness of the defect can additionally be inferred from its decision to switch the gear shifting mechanism in the Class Vehicles back to a polystable design.

49.    By at least as early as November 2014 (if not earlier), FCA made the decision to stop using the ZF Shifter.  As of November 27, 2014, FCA ceased producing Dodge Chargers and Chrysler 300s with the defective ZF Shifters, switching future models to a polystable system. As of December 22, 2015, FCA ceased producing Jeep Grand Cherokees with ZF Shifters. Beginning with the 2016 model, FCA produced Jeep Grand Cherokees with polystable shifters.

**III.**    **FCA Promotes the Class Vehicles'
          Safety, Reliability, and Superior Design.**

50.    Notwithstanding its exclusive knowledge of the risk posed by the defective ZF Shifter, FCA failed to disclose to the public or to consumers purchasing or leasing one of the Class Vehicles that the ZF Shifter was defectively designed and presented a safety risk.  Instead, FCA continued to market Class Vehicles containing the defect and, until it announced a recall of the vehicles in April 2016, touted the vehicles as safe.

51.    Indeed, FCA promoted the Class Vehicles on the basis of their safety and reliability, causing consumers, including Plaintiff and other members of the Classes, to purchase or lease Class Vehicles based on the misrepresentation that the vehicle was safe and reliable and would operate in the manner expected.

52.     According to FCA's website, a main area on which it concentrates its research and the development of its vehicles is "safety and connected vehicles: with a specific focus on all aspects of safety (active, passive and preventive) and on the development of efficient info-mobility systems."[2]

53.     FCA's advertising and marketing for its vehicles perpetuates the message that the Class Vehicles are safe to operate and do not present unreasonable, unexpected risks of harm due to defects in the transmission and gear-shifting system.

54.     FCA boldly proclaims on its website that the Jeep brand's "full line of vehicles provides owners with a sense of safety and security to handle any adventure with confidence."[3]

55.     Indeed, on its Jeep website, FCA boasts that the 2015 Jeep Grand Cherokee has "over 70 available Safety and Security features."[4]  A screen capture of the relevant portion of the webpage is below.

---

[2] *See* http://www.fcagroup.com/en-US/innovation/Pages/mission.aspx (accessed July 21, 2016).

[3] *See* http://www.fcagroup.com/en-US/group/brands/Pages/jeep.aspx (accessed July 22, 2016).

[4] *See* http://www.jeep.com/en/grand-cherokee/safety-security/ (accessed July 22, 2016).



56.     Similarly, FCA boldly proclaims on its website for the Dodge brand that the 2014 Dodge Charger has "[m]ore than 65 standard and available safety and security features."[5]  A screen capture of the relevant portion of the webpage is below.



---

[5] *See* http://m.dodge.com/en/2014/charger/safety_security/ (accessed July 22, 2016).

57.    Likewise with the 2013 Chrysler 300, FCA boldly proclaimed on its Chrysler website that the vehicle provided "top-of-the-line safety and security."[6]  A screen capture of the relevant portion of the webpage is below.



58.    Nowhere, however, did FCA disclose the safety risks associated with the ZF Shifter installed in these or the other Class Vehicles, despite FCA's awareness of the dangers it posed.

**IV.    The NHTSA Investigates The ZF Shifter And Concludes There Is A Defect.**

59.    On August 20, 2015, the NHTSA's Office of Defects Investigation ("ODI") opened Preliminary Evaluation (PE15-030) to investigate numerous reports filed by consumers alleging rollaway incidents in 2014-2015 Jeep Grand Cherokees.

---

[6] Accessed via the Internet Archive Wayback Machine.  *See*, *e.g.*, http://web.archive.org/web/20140217230651/http://www.chrysler.com/en/2013/300/safety/ (reflecting the web page's content as of Feb. 17, 2014) (accessed July 22, 2016).

60.     On February 5, 2016, the NHTSA-ODI issued its closing report for the

investigation and, based on the results of its investigation, which included communications with

FCA and with consumers, stated that:

> NHTSA testing during PE15-030 indicates that operation of the
> Monostable shifter is not intuitive and provides poor tactile and
> visual feedback to the driver, increasing the potential for
> unintended gear selection.
>
> ODI's analysis of the PE15-030 complaint and field report data
> identified 306 incidents of vehicle rollaway following intended
> shifts to Park in the 2014-2015 Grand Cherokee. These resulted in
> 117 alleged crashes. Twenty-eight of the crashes reportedly
> caused injuries, including 3 with a fractured pelvis and 4 others
> requiring some degree of hospitalization (a ruptured bladder,
> fractured kneecap, broken ribs, damaged to right leg). Other
> injuries include reports of a broken nose, facial lacerations
> requiring stitches, sprained knees, severe bruising, and trauma to
> legs.

61.     Accordingly, that same day, on February 5, 2016, the NHTSA-ODI opened an

Engineering Analysis (EA16-002) to "assess the scope, frequency, and safety-related

consequences of the alleged defect" and widened the scope of the inquiry to include the 2012-

2014 Dodge Charger and the 2012-2014 Chrysler 300.

## V.     FCA Recalls The Class Vehicles But
Attempts To Shift Blame Away From The ZF Shifter.

62.     On or about April 22, 2016, FCA initiated a recall of the Class Vehicles by

submitting a recall report to the NHTSA regarding the defective ZF Shifter in the Class Vehicles

(NHTSA Recall #16V-240, FCA Recall #S27).

63.     In its April 22, 2014 report, FCA admitted that the ZF Shifter is defective and that

a driver of one of the Class Vehicles can -- because of the ZF Shifter -- erroneously conclude that

a vehicle's transmission is in the Park position, when, in fact, it is not.

64.     Unfortunately for Plaintiff and the members of the Classes, FCA limited the scope of its recall to address only the risk of rollaway incidents where a driver exits a vehicle. However, rollaway incidents are but one expression of the general safety issue posed by the defective ZF Shifter -- namely, that a driver cannot rely on the ZF Shifter to effectively switch to the gear desired.  FCA's recall does not address the generally defective nature of the ZF Shifter, nor any of the other potential expressions of that defect (e.g., slower than expected three-point turns).

65.     Indeed, in describing the defect and safety risk in its recall report to the NHTSA, FCA stated that:

> [T]he existing strategies built into [the Class Vehicles] to deter drivers from exiting the vehicle after failing to put the transmission into PARK have not stopped some from doing so.   Drivers erroneously concluding that their vehicle's transmission is in the PARK position may be struck by the vehicle and injured if they attempt to get out of the vehicle while the engine is running and the parking brake is not engaged.   FCA US has therefore determined that the absence of an additional mechanism to mitigate the effects of driver error in failing to shift the monostable gear selector into PARK prior to exiting the vehicle constitutes a defect presenting a risk to motor vehicle safety.

66.     FCA further stated that its remedy for the defect would be a "Voluntary Safety Recall on all affected vehicles to update software to include an additional mechanism to mitigate the effect of operator error in failing to shift the monostable gear selector into PARK prior to exiting the vehicle."

67.     Because FCA limited the scope of its recall to address only rollaway incidents where a driver exits a vehicle, the recall offers a remedy that only partially addresses the safety risk presented by the defective ZF Shifter.  Accordingly, the Class Vehicles, even if brought in for service pursuant to the recall, remain a danger to drivers, passengers, and bystanders.

68.    Moreover, as illustrated by its description of the defect, FCA refused to take responsibility for its installation of an inherently defective gear-shifting system and instead advocated the position that driver error was to blame for the increased risk of rollaway vehicles and injury to drivers, passengers, and the public.

69.    Indeed, in an April 22, 2016 press release accompanying its filing of a recall notice with the NHTSA, FCA focused on driver error, rather than design or manufacturing, stating that "[t]he vehicles involved in these events were inspected and no evidence of equipment failure was found" and that "unless due care is taken, drivers may draw erroneous conclusions about the status of their vehicles."[7]

70.    FCA gave no indication of when a remedy would be provided, but instead "urge[d] customers to follow the instructions in their owners' manuals"[8] and, by implication, to continue to drive the Class Vehicles, despite the presence of an admittedly defective gear-shifting system.

71.    On or about May 14, 2016, FCA issued to Plaintiff and other members of the Classes an interim letter notifying them of the recall.  In the letter, FCA stated to owners and lessees of the Class Vehicles that:

> Your vehicle may roll away, striking and injuring you, your passengers, or bystanders, if the vehicle's engine is left running, the parking brake is not engaged, and the transmission is not in the "PARK" position before exiting the vehicle.
>
> Drivers may inadvertently fail to achieve the "PARK" position before exiting the vehicle.  The electronic shift lever in your vehicle does not move like a conventional shifter.  Your shift lever is spring loaded and returns to the same center position like a

---

[7] *See* http://media.fcanorthamerica.com/newsrelease.do?id=17455 (accessed July 29, 2016).

[8] *Id.*

joystick, always returning to the center position after the desired
gear is selected.

72.     The letter stated that a remedy to the problem was not yet available and might not

be available until late 2016.

73.     In addition, and as further evidence of the defective nature of the ZF Shifter, on

June 8, 2016, in response to inquiries by the NHTSA, Masarati North America, Inc., a company

affiliated with FCA, issued a recall notice for its 2014 Masarati Quattroportes and Ghiblis due to

a similarly defective shifter.

74.     On or about June 19, 2016, Anton Yelchin, a promising young actor best known

for playing Pavel Checkov in the recent reboot of the Star Trek movie franchise, was crushed to

death by a rollaway Jeep Grand Cherokee in the driveway of his home.[9]  Media reports indicate

that he was pinned by the Jeep against a stone mailbox and metal gate in his driveway.[10]

## VI.    NHTSA Closes Engineering Analysis And Confirms ZF Shifter Is Defectively Designed.

75.     On or about June 24, 2016, in light of the recall notice issued by FCA, NHTSA

closed its Engineering Analysis of the Class Vehicles.  The closing report found that at least 686

complaints regarding the defect had been filed (with at least 526 submitted to FCA) and that at

least 266 crashes or fires and 68 injury incidents were attributable to the defect.

76.     The NHTSA confirmed that the ZF Shifter was defectively designed and noted

that:

> FCA received negative consumer feedback for the Monostable
> shifters shortly after the subject vehicles entered the market.  Field

_____

[9] *See* http://www.cnn.com/2016/06/19/entertainment/actor-anton-yelchin-killed/ (accessed July
22, 2016).

[10] *See* http://www.dailymail.co.uk/tvshowbiz/article-3649368/Star-Trek-actor-Anton-Yelchin-
dies-car-crash-age-27.html (accessed July 22, 2015).

data indicate that the design resulted in higher error rates during attempted shifts to Park and higher rates of powered rollaway incidents. The Monostable design appears to violate several basic design guidelines for vehicle controls, such as: 1) be consistent; 2) controls and displays should function the way people expect them to function; 3) minimize what the user has to remember; and 4) operations that occur most often or have the greatest impact on driving safety should be the easiest to perform. FCA changed to Polystable electronic gearshift assemblies in MY 2015 Charger/300 cars and MY 2016 Jeep Grand Cherokee vehicles (see Figure 2). The Polystable gearshift assemblies stay in the position of the selected gear, similar to a standard mechanical shifter, providing drivers with the expected tactile and visual feedback (i.e., works as expected and does not require additional thought or attention).

77. The closing report also acknowledged that Mr. Yelchin's untimely death appeared related to the defect in the ZF Shifter installed in Mr. Yelchin's 2015 Jeep Grand Cherokee.

## VII. FCA Releases A Software Patch For Certain Jeep Grand Cherokee Models Purporting To Remedy Safety Issues Presented By The Defective ZF Shifter.

78. On June 24, 2016, FCA issued a follow-up recall notice to owners and lessees of certain models of Jeep Grand Cherokees. According to FCA, the remedy would involve taking the vehicle to an FCA dealer, who would "install new software to include an 'Auto Park' feature which eliminates the possibility of the driver inadvertently failing to place the transmission into 'PARK' prior to exiting the vehicle." The letter also stated that the dealer would provide additional information and guidance regarding the new feature, stating:

> You will receive an "Auto Park" addendum card explaining the vehicle's new "Auto Park" feature. After your vehicle receives the software update, please review the addendum card with all of the drivers of your vehicle and then store the addendum card in the owner's manual for future reference. Your dealer will also review/demonstrate this new "Auto Park" feature and answer any questions or concerns.

79. However, as noted above, the recall addresses only one specific manifestation of the fundamental safety risk presented by the defective ZF Shifter, and the ZF Shifter creates a dangerous environment whether or not the driver has exited the vehicle.

80. Indeed, even after the software patch for certain models of the Jeep Grand Cherokee was released, the NHTSA continued to receive complaints from consumers indicating that the software patch failed to address the fundamental defect of the ZF Shifter -- namely, that the driver can believe the car to be in a particular gear, when, in fact, it is not. Below are a selection of representative complaints (reproduced verbatim) filed with the NHTSA by owners and lessees of Class Vehicles who received the software patch pursuant to FCA's recall of the Class Vehicles.

> Date Complaint Filed: 06/29/2016; Date of Incident: 06/28/2016
> Year/Make/Model: 2015 Jeep Grand Cherokee
> Summary: THE CONTACT OWNS A 2015 JEEP GRAND CHEROKEE. THE CONTACT STATED THAT THE VEHICLE WAS TAKEN IN FOR RECALL REPAIRS ASSOCIATED WITH NHTSA CAMPAIGN NUMBER: 16V240000 (POWER TRAIN); HOWEVER, THE SAFETY REMEDY WAS NOT COMPLETED. THE CONTACT WAS INFORMED BY THE DEALER THAT THE COMPONENT FOR THE RECALL WAS NOT GOING TO BE REPAIRED, AND THEY WOULD REPAIR THE VEHICLE TO DISABLE STARTING IF THERE WERE ANY DOORS AJAR. THE CONTACT DID NOT FEEL SAFE DRIVING THE VEHICLE. THE MANUFACTURER WAS NOTIFIED OF THE FAILURE AND NO FURTHER REPAIRS WERE MADE. THE FAILURE MILEAGE WAS 21,434.
>
> Date Complaint Filed: 07/07/2016; Date of Incident: 07/07/2016
> Year/Make/Model: 2015 Jeep Grand Cherokee
> Summary: IN ADDITION TO THE UNSAFE ELECTRONIC GEAR SHIFTER, WHICH HAS NO ACTUAL FIX, THIS CARE HAS HAD REPEATED PROBLEMS WITH STAGNATION IN SHIFTING GEARS AND IS VERY ROUGH AND UNPREDICTABLE IN ITS SHIFT PATTERN AND ENGINE RPM. WE HAD THIS CAR IN ONCE ALREADY FOR THIS ISSUE AND AFTER A "SOFTWARE" UPDATE THE SHIFTING PROBLEMS HAVE WORSENED. VERY

23

UNHAPPY WITH THE SAFETY IMPLICATIONS OF THIS
ENTIRE TRANSMISSION AND SHIFTING SYSTEM.

Date Complaint Filed: 07/19/2016; Date of Incident: 07/13/2016
Year/Make/Model: 2014 Jeep Grand Cherokee
Summary: THE CONTACT OWNS A 2014 JEEP GRAND
CHEROKEE. THE CONTACT STATED THAT THE VEHICLE
INDEPENDENTLY ROLLED DOWN A HILL. THE VEHICLE
DID NOT CRASH, BUT STALLED ONCE IT WAS ON A FLAT
SURFACE. THE VEHICLE WAS PREVIOUSLY SERVICED
PER NHTSA CAMPAIGN NUMBER: 16V240000 (POWER
TRAIN). THE VEHICLE WAS TAKEN BACK TO THE
DEALER, BUT WAS NOT DIAGNOSED OR REPAIRED. THE
FAILURE MILEAGE WAS UNAVAILABLE.

Date Complaint Filed: 07/21/2016; Date of Incident: 07/16/2016
Year/Make/Model: 2014 Jeep Grand Cherokee
Summary: THE CONTACT OWNS A 2014 JEEP GRAND
CHEROKEE. THE CONTACT STATED THAT THE GEAR
SHIFTER FAILED TO GO INTO PARK. THE FAILURE
RECURRED NUMEROUS TIMES. THE VEHICLE WAS
TAKEN TO THE DEALER WHERE A SOFTWARE UPDATE
OF THE GEAR SHIFTER WAS PERFORMED. THE CONTACT
RECEIVED NOTIFICATION OF NHTSA CAMPAIGN
NUMBER: 16V240000 (POWER TRAIN). THE VEHICLE WAS
NOT REPAIRED. THE MANUFACTURER WAS MADE
AWARE OF THE FAILURE. THE APPROXIMATE FAILURE
MILEAGE WAS 19,000.

Date Complaint Filed: 07/26/2016; Date of Incident: 7/21/2016
Year/Make/Model: 2015 Jeep Grand Cherokee
Summary: THE CONTACT OWNS A 2015 JEEP GRAND
CHEROKEE. THE CONTACT STATED THAT WHILE
DRIVING FROM A COMPLETE STOP, THE TRANSMISSION
INDEPENDENTLY SHIFTED INTO THE PARK POSITION.
THE VEHICLE WAS RESTARTED AND IT FUNCTIONED AS
NORMAL. THE FAILURE OCCURRED ONLY AFTER THE
VEHICLE WAS SERVICED UNDER NHTSA CAMPAIGN
NUMBER: 16V240000 (POWER TRAIN). THE CONTACT
MENTIONED THAT THE RECALL REMEDY WAS
INSUFFICIENT AND SCHEDULED AN APPOINTMENT
WITH THE DEALER FOR THE VEHICLE TO BE
DIAGNOSED AND REPAIRED. THE MANUFACTURER WAS
NOT NOTIFIED OF THE FAILURE. THE APPROXIMATE
FAILURE MILEAGE WAS 36,200.

Date Complaint Filed: 07/28/2016; Date of Incident: 7/20/2016
Year/Make/Model: 2015 Jeep Grand Cherokee
Summary: TWO WEEKS AGO, THE JEEP DEALER
COMPLETED THE AUTOMATIC TRANSMISSION RECALL
WHICH INSURES THE TRANSMISSION IS IN PARK WHEN
A DRIVER DOOR IS OPENED. HOWEVER, THE PROBLEM
OF KNOWING WHAT GEAR THE JEEP IS IN REMAINS..
SINCE THE RECALL WAS INSTALLED, THERE HAVE
BEEN TWO INSTANCES WHERE I THOUGHT THE JEEP
WAS PLACED IN ONE GEAR BUT ACTUALLY WAS IN A
DIFFERENT GEAR. ONCE, I THOUGHT I HAD SHIFTED
THE JEEP INTO PARK BUT IT WAS IN REVERSE. A 2ND
TIME I THOUGHT I WAS IN DRIVE BUT ACTUALLY WAS
IN NEUTRAL. THE SAFETY ISSUE REMAINS THAT IF A
DRIVER IS MILDLY DISTRACTED AFTER THINKING
HE/SHE HAS SWITCHED THE TRANSMISSION INTO PARK;
BUT ACTUALLY THE TRANSMISSION IS IN REVERSE,
THE JEEP COULD BACK OVER A PERSON OR HIT
SOMETHING BEHIND IT.

81.    As illustrated by the experiences of Plaintiff and other drivers, the software patch

does not fully remedy the safety issues created by the defective ZF Shifter's monostable design.

82.    Moreover, only a limited number of specific makes and models of Class Vehicles

have been provided even this, limited software patch.  As noted by numerous complaints to the

NHTSA subsequent to the initiation of the recall, FCA has failed to provide a remedy for the

defect in a reasonable amount of time.

**VIII.    FCA's Actions Harm Consumers.**

83.    Knowledge and information regarding the defective ZF Shifter were in the

exclusive and superior possession of Defendant and its dealers, and that information was not

provided to Plaintiff and members of the Classes.  Instead, FCA concealed the defect and safety

risk from Plaintiff and members of the Classes.  Accordingly, FCA intentionally, negligently,

and/or recklessly omitted and concealed from Plaintiff and members of the Classes the defect in

the Class Vehicles, even though FCA knew or should have known of the defects in Class

Vehicles and that the Class Vehicles' design violated several basic guidelines.

84.    No reasonable consumer expects a vehicle manufacturer to conceal a defect or known safety risk that puts drivers, passengers, and the public at risk.  Accordingly, Plaintiff and members of the Classes had no reasonable way to know that Class Vehicles contained a gear shifting system that was defective in materials, workmanship, design, and/or manufacture and posed a significant safety risk.

85.    FCA knew, or should have known, that the defect in the ZF Shifter and the associated safety risk would be material to owners and lessees of the Class Vehicles, and that the defect and associate risk, absent disclosure by FCA, would not reasonably be discoverable by Plaintiff and members of the Classes before they purchased or leased a Class Vehicle.

86.    Plaintiff and the member of the Classes, as a result of the representations made by FCA, paid premiums to purchase the Class Vehicles.  Vehicles that are safe sell for more than vehicles that are less so, and consumers are willing to, and do, pay a price premium for the Class Vehicles because FCA promises they are safe, when they are not.

87.    Moreover, Plaintiff and the members of the Classes were harmed by FCA the moment they purchased or leased a Class Vehicle because they did not receive what they had bargained for -- a well-designed vehicle that was safe to operate.

88.    In addition, because of the highly-publicized death of actor Anton Yelchin at the hands of his rollaway 2015 Jeep Grand Cherokee, the design defect of the ZF Shifter in the Class Vehicles has been widely disseminated, causing a decline in the value of the Class Vehicles, including those that have been subject to the software patch issued by FCA pursuant to its recall.

89.    As a result of FCA's inequitable, misrepresentative, and/or fraudulent practices, Plaintiff and other members of the Classes have suffered losses in money and/or property.  Had they known of the defect at the time they purchased or leased their Class Vehicles, Plaintiff and

other members of the Classes would not have purchased or leased those vehicles, or would have

paid substantially less for the vehicles than they did.

## TOLLING OF THE STATUTE OF LIMITATIONS AND ESTOPPEL

90.    Any applicable statute of limitations has been tolled by Defendant's knowing and

active concealment of the defective design of the ZF Shifter and the misrepresentations and

omissions alleged herein.  Plaintiff and the members of the Classes could not have discovered

through the exercise of reasonable diligence that the ZF Shifter was defective and presented a

safety risk and were deceived regarding the ZF Shifter and could not reasonably discover the

defect or Defendant's deception with respect to the defect.

91.    Plaintiff and members of the Classes did not discover and did not know of any

facts that would have caused a reasonable person to suspect that Defendant was concealing a

defect and/or that the Class Vehicles contained a ZF Shifter and corresponding safety risk.  As

alleged herein, the existence of the ZF Shifter and corresponding safety risk were material to

Plaintiff and members of the Classes at all relevant times.  Within the time period of any

applicable statutes of limitations, Plaintiff and members of the Classes could not have discovered

through the exercise of reasonable diligence that Defendant was concealing the defect in the ZF

Shifter.

92.    At all relevant times, Defendant was and is under a continuing duty to disclose to

Plaintiff and the Classes the true character, quality, and nature of the Class Vehicles, including

the ZF Shifter.  Defendant knowingly, actively, and affirmatively concealed the true character,

nature, and quality of the ZF Shifter, including that it was defectively designed and presented a

safety risk.

93.    As a result of Defendant's material misrepresentations and/or active concealment,

any and all statutes of limitations otherwise applicable to the allegations herein have been tolled

by the discovery rule, and Defendant is estopped from relying on any statutes of limitations in

defense its defense of this action.

## CLASS ACTION ALLEGATIONS

94.    Plaintiff brings this action on his own behalf and, pursuant to Rule 23 of the

Federal Rules of Civil Procedure, on behalf of the following proposed class and subclass

(collectively, the "Classes"):

> **Nationwide Class**
> All persons who purchased or leased an FCA vehicle equipped
> with the ZF Shifter.
>
> **New York Subclass**
> All members of the Nationwide Class who reside in New York
> State or purchased or leased in New York State an FCA vehicle
> equipped with the ZF Shifter.

95.    Plaintiff reserves the right to amend the above definitions, or to propose other or

additional classes, in subsequent pleadings and/or motions for class certification.

96.    Plaintiff is a member of each of the Classes.

97.    Excluded from the Classes are Defendant; any parent, subsidiary, or affiliate of

Defendant; any entity in which Defendant has or had a controlling interest, or which Defendant

otherwise controls or controlled; and any officer, director, employee, legal representative,

predecessor, successor, or assignee of Defendant.

98.    This action satisfies all the requirements for a class action under Rule 23(b)(3):

99.    <u>Numerosity:</u> The Classes are so numerous that joinder of all members, whether

otherwise required or permitted, is impracticable.  There are at least 800,000 FCA vehicles

containing the defective ZF shifter that have been sold or leased in the United States.

Accordingly, Plaintiff believes that there are thousands of members of the Classes as described

above, though the exact number and identities of the members of the Classes are currently

unknown.

100.    <u>Commonality and Predominance:</u> There are questions of law or fact common to

the Classes that predominate over any questions affecting only individual members, including,

but not limited to, the following:

  a.  Whether the ZF Shifter installed in the Class Vehicles contains a
    design defect and/or a defect in material, manufacturing, and/or
    workmanship;

  b.  Whether the ZF Shifter installed in the Class Vehicles presents a
    safety risk;

  c.  Whether FCA knew or should have known that the ZF Shifter
    installed in the Class Vehicles is defective and presents a safety
    risk and, if so, how long FCA has known or should have known of
    it;

  d.  Whether FCA had a duty to disclose that the ZF Shifter installed in
    the Class Vehicles is defective and/or presents a safety risk;

  e.  Whether FCA breached its duty to disclose that the ZF Shifter
    installed in the Class Vehicles is defective and/or presents a safety
    risk;

  f.  Whether FCA intentionally and knowingly falsely misrepresented,
    concealed, suppressed, and/or omitted material facts, including the
    fact that the ZF Shifter installed in the Class Vehicles is defective
    and/or presents a safety risk;

  g.  Whether members of the Classes overpaid for a Class Vehicle;

  h.  Whether the software patch provided by FCA in its recall
    adequately remedied the safety hazard created by the ZF Shifter;

  i.  Whether FCA breached its express and/or implied contractual
    obligations to Plaintiff and members of the Classes;

  j.  Whether FCA violated the Magnuson-Moss Warranty Act, 15
    U.S.C. § 2301, *et seq.*;

  k.  Whether FCA's conduct as described herein breached its express
    or implied warranties to Plaintiff and the members of the Classes;

l.  Whether FCA's conduct as described herein was deceptive and/or misleading, including whether FCA negligently misrepresented or omitted material facts, including the fact that the ZF Shifter installed in the Class Vehicles is defective and/or presents a safety risk;

m.  Whether FCA made material misrepresentations and/or omissions concerning the standard, quality, or grade of the Class Vehicles and the ZF Shifter;

n.  Whether Defendant's conduct as described herein violated New York GBL § 349 *et seq.*;

o.  Whether Defendant's conduct as described herein violated New York GBL § 350 *et seq.*;

p.  Whether Defendant was unjustly enriched by the conduct described in this herein;

q.  Whether Plaintiff and the members of the Classes are entitled to equitable relief, including, but not limited to, restitution or injunctive relief -- including a repair of the defectively designed ZF Shifter; and

r.  Whether Plaintiff and the other members of the Classes are entitled to damages and other monetary relief and, if so, in what amount.

101.  Typicality: The claims asserted by Plaintiff are typical of the claims of the members of the Class he seeks to represent.

102.  Adequacy: Plaintiff will fairly and adequately protect the interests of the Classes, and Plaintiff has retained attorneys experienced in class and complex litigation.

103.  Superiority: A class action is superior to other available methods for the fair and efficient adjudication of the controversy, for at least the following reasons:

a.  Absent a class action, members of the Classes, as a practical matter, will be unable to obtain redress;

b.  It would be a substantial hardship for most individual members of the Classes if they were forced to prosecute individual actions;

c.  When the liability of Defendant has been adjudicated, the Court will be able to determine the claims of all members of the Classes;

     d.     A class action will permit an orderly and expeditious administration of the Classes' claims; foster economies of time, effort, and expense; and ensure uniformity of decisions;

     e.     The lawsuit presents no difficulties that would impede its management by the Court as a class action;

     f.     Defendant has acted on grounds generally applicable to members of the Classes, making class-wide monetary relief appropriate; and

     g.     Prosecuting separate actions by individual class members would create a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for FCA.

104.    Plaintiff also seeks certification under Rule 23(b)(2).  Defendant has acted or refused to act on grounds that apply generally to the Classes, including failing to provide complete remedial measures for the defective ZF Shifter to Plaintiff and the Classes, such that final injunctive relief, including corrective advertising, appropriate repairs and/or replacements, and other injunctive relief, is appropriate in respect to the Classes as a whole.

## CAUSES OF ACTION

**FIRST CAUSE OF ACTION**
**Magnuson-Moss Warranty Act ("MMWA")**
**15 U.S.C. § 2301, *et seq.***
**(On behalf of the Nationwide Class or, alternatively, the New York Subclass)**

105.    Plaintiff repeats and re-alleges the allegations contained above as if fully set forth herein.

106.    Plaintiff brings this count under the Magnuson-Moss Warranty Act ("MMWA") 15 U.S.C. § 2301, *et seq.*, on behalf of himself and the Nationwide Class or, alternatively, on behalf of the New York Subclass.

107.    Plaintiff and the members of the Classes are "consumers" within the meaning of MMWA, 15 U.S.C. § 2301(3).

108.    FCA is a "supplier" and "warrantor" within the meaning of the MMWA, 15 U.S.C. § 2301(4)-(5).

109.    The Class Vehicles are "consumer products" within the meaning of the MMWA, 15 U.S.C. § 2301(1).

110.    The MMWA, 15 U.S.C. § 2301(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty.

111.    In connection with the purchase or lease of each of the Class Vehicles, FCA provided Plaintiff and members of the Classes with one or more express warranties, including: (1) a Basic Limited Warranty which includes virtually bumper to bumper coverage for 3 years or 36,000 miles, whichever occurs first; and/or (2) a Powertrain Limited Warranty for 5 years or 100,000 miles whichever occurs first, from the date the vehicle was first placed in service, which covers engine and transmission parts including the ZF Shifter.  Under warranties provided to Plaintiff and members of the Classes, FCA promised to repair or replace covered defective engine components arising out of defects in materials and/or workmanship, including the ZF Shifter, at no cost to owners and lessees of the Class Vehicles.

112.    FCA's express warranties are written warranties within the meaning of the MMWA, 15 U.S.C. § 2301(6).  The Class Vehicles' implied warranties fall within the meaning of the MMWA, 15 U.S.C. § 2301(7).

113.    As alleged herein, FCA breached these warranties.  Without limitation, the Class Vehicles share a common defect in that they are equipped with a ZF Shifter that is defectively designed and unsafe, contrary to FCA's representations about its vehicles.  Through its recall of the Class Vehicles, FCA has acknowledged that the Class Vehicles are not of the standard, quality, or grade that FCA represented at the time of purchase or lease.

114.    Affording FCA a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile.  FCA has had over a year to provide a suitable remedy for the defect in the Class Vehicles and has failed to do so.

115.    At the time of sale or lease of each Class Vehicle and all relevant times thereafter, FCA knew, should have known, or was reckless in not knowing of its misrepresentations and omissions concerning the Class Vehicles' inability to perform as warranted, but nonetheless failed to rectify the situation and/or disclose the defect.  Accordingly, the remedies available under any informal settlement procedure would be inadequate and any requirement that Plaintiff or the members of the Classes resort to an informal dispute resolution procedure and/or afford FCA a reasonable opportunity to cure its breach of warranties is excused and thereby deemed satisfied.

116.    Plaintiff and the other members of the Classes would suffer economic hardship if they returned their Class Vehicles but did not receive the return of all payments made by them. Because FCA is refusing to acknowledge any revocation of acceptance and return immediately any payments made, Plaintiff and the members of the Classes have not re-accepted their Class Vehicles by retaining them.

117.    The amount in controversy of Plaintiff's individual claims meets or exceeds the sum of $25.  The amount in controversy of this action exceeds the sum of $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit.

118.    By reason of the foregoing, Defendant is liable to Plaintiff and the members of the Class for damages they have suffered as a result of Defendant's actions, including diminution in the value of the Class Vehicles, the amount of which will be determined at trial, as well as any other remedies afforded at law or in equity.

## SECOND CAUSE OF ACTION
### New York Deceptive Practices Act
### N.Y. Gen. Bus. Law § 349
### (On behalf of the New York Subclass)

119.    Plaintiff repeats and re-alleges the allegations contained above as if fully set forth herein.

120.    Plaintiff brings this cause of action on behalf of himself and the other members of the New York Subclass.

121.    Plaintiff and New York Subclass were consumers and the end users and intended beneficiaries of FCA's products.

122.    As a manufacturer, marketer, and distributor of vehicles, FCA was engaged in consumer-oriented conduct within the intended ambit of GBL § 349.

123.    FCA's actions and/or omissions as described herein violated GBL § 349 *et seq.*, which was enacted to protect the consuming public from those who engage in deceptive acts or practices in the conduct of any business, trade, or commerce.

124.    Specifically, FCA knowingly misrepresented and intentionally omitted material information regarding the safety and effectiveness of the gear shifting system installed in the Class Vehicles.

125.    Despite knowledge that the ZF Shifter installed in the Class Vehicles is defective, FCA failed to inform Plaintiff and the members of the Class that it is defective and presents a safety risk.

126.    A reasonable consumer would understand and believe from FCA's actions and omissions that the Class Vehicles were free of safety hazards.

127.    FCA's deceptive and misleading actions and omissions as set forth herein caused injury to Plaintiff and the members of the New York Subclass, including that they paid a price premium for their vehicles as a direct result of FCA's deceptive actions.

128.    By reason of the foregoing, FCA is liable to Plaintiff and the members of the New York Subclass for actual damages they have suffered as a result of FCA's actions, the amount of which will be determined at trial, statutory damages, treble damages, reasonable attorneys' fees and costs, and punitive damages, as well as any other remedies afforded at law or in equity.

**THIRD CAUSE OF ACTION**
**New York False Advertising Act**
**N.Y. Gen. Bus. Law § 350**
**(On behalf of the New York Subclass)**

129.    Plaintiff repeats and re-alleges the allegations contained above as if fully set forth herein.

130.    Plaintiff brings this cause of action on behalf of himself and the other members of the New York Subclass.

131.    This action is brought to secure redress for the deceptive practices perpetrated by FCA against Plaintiff and the New York Subclass.

132.    As a manufacturer, marketer, and distributor of vehicles, FCA was engaged in the "conduct of business, trade or commerce" within the intended ambit of GBL § 350.

133.    FCA's actions and/or omissions as described herein violated GBL § 350 *et seq.*, which makes unlawful "[f]alse advertising in the conduct of any business, trade or commerce."

134.    Through its advertising, FCA caused to be made or disseminated throughout New York statements that were untrue or misleading, and that were known, or which should have been known to FCA, to be untrue and misleading to consumers in New York.

135.    Specifically, FCA knowingly and willfully misrepresented and intentionally omitted material information regarding the safety and effectiveness of the gear shifting system installed in the Class Vehicles.

136.    Despite knowledge that the ZF Shifter installed in the Class Vehicles is defective, FCA failed to inform Plaintiff and the members of the Class that it is defective and presents a safety risk.

137.    The misrepresentations and omissions regarding the defect in Class Vehicles, and FCA's failure to disclose and active concealing of the defect, were material and likely to deceive a reasonable consumer, who would understand and believe from FCA's actions and omissions that the Class Vehicles were free of safety hazards.

138.    FCA's deceptive and misleading actions and omissions as set forth herein caused injury to Plaintiff and the members of the New York Subclass.

139.    By reason of the foregoing, FCA is liable to Plaintiff and the members of the New York Subclass for actual damages they have suffered as a result of FCA's actions, the amount of which will be determined at trial; statutory damages in the amount of $500 for each member of the New York Subclass; treble damages up to $10,000 for each member of the New York Subclass; reasonable attorneys' fees and costs; injunctive relief prohibiting FCA's unlawful and deceptive practices; and punitive damages, as well as any other remedies afforded at law or in equity.

**FOURTH CAUSE OF ACTION**
**Breach of Implied Warranty of Merchantability**
**N.Y. U.C.C. Law §§ 2-314 and 2A-212**
**(On behalf of the New York Subclass)**

140.    Plaintiff repeats and re-alleges the allegations contained above as if fully set forth herein.

141.    Plaintiff brings this cause of action on behalf of himself and the members of the New York Subclass.

142.    FCA is and was at all relevant times a "merchant" with respect to motor vehicles under N.Y. UCC Law § 2-104(1) and a "seller" of motor vehicles under § 2-103(1)(d).

143.    With respect to leases, FCA is and was at all relevant times a "lessor" of motor vehicles under N.Y. UCC Law § 2A-103(1)(p).

144.    The Class Vehicles are and were at all relevant times "goods" within the meaning of N.Y. UCC Law §§ 2-105(1) and 2A-103(1)(h).

145.    A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to N.Y. UCC Law §§ 2-314 and 2A-212.

146.    These Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used.

147.    Specifically, the Class Vehicles are inherently defective in that they contain the ZF Shifter, which, as alleged above, is not adequately designed, manufactured, and/or tested and presents a safety risk, including, but not limited to, the possibility of uncontrolled rollaway accidents and accidents due to slower-than expected shifts between gears.

148.    FCA was provided notice of these issues by the investigations of the NHTSA, numerous complaints filed against it including the instant Complaint, and by numerous individual letters and communications sent by Plaintiff and others within a reasonable amount of time after the allegations of defects in the Class Vehicles became public.

149.    As a direct and proximate result of the FCA's breach of the implied warranty of merchantability, Plaintiff and the other members of the New York Subclass have been damaged in an amount to be proven at trial.

**FIFTH CAUSE OF ACTION**
**Breach of Express Warranty**
**N.Y. U.C.C. Law §§ 2-313 and 2A-210**
**(On behalf of the New York Subclass)**

150.    Plaintiff repeats and re-alleges the allegations contained above as if fully set forth herein.

151.    Plaintiff brings this cause of action on behalf of himself and the members of the New York Subclass.

152.    FCA is and was at all relevant times a "merchant" with respect to motor vehicles under N.Y. UCC Law § 2-104(1) and a "seller" of motor vehicles under § 2-103(1)(d).

153.    With respect to leases, FCA is and was at all relevant times a "lessor" of motor vehicles under N.Y. UCC Law § 2A-103(1)(p).

154.    The Class Vehicles are and were at all relevant times "goods" within the meaning of N.Y. UCC Law §§ 2-105(1) and 2A-103(1)(h).

155.    In connection with the purchase or lease of each of the Class Vehicles, FCA provided Plaintiff and members of the Classes with one or more express warranties, including: (1) a Basic Limited Warranty which includes virtually bumper to bumper coverage for 3 years or 36,000 miles, whichever occurs first; and/or (2) a Powertrain Limited Warranty for 5 years or 100,000 miles whichever occurs first, from the date the vehicle was first placed in service, which covers engine and transmission parts including the ZF Shifter.  Under warranties provided to Plaintiff and members of the Classes, FCA promised to repair or replace covered defective

engine components arising out of defects in materials and/or workmanship, including the ZF

Shifter, at no cost to owners and lessees of the Class Vehicles.

156.    As manufacturers of light-duty vehicles, FCA was required to provide these

warranties to purchasers or lessees of the Class Vehicles.

157.    FCA's warranties formed the basis of the bargain that was reached when Plaintiff

and other members of the New York Subclass purchased or leased from FCA their Class

Vehicles equipped with the defective ZF Shifter system.

158.    Plaintiff and the New York Subclass members experienced defects within the

warranty period.  Despite the existence of warranties, FCA failed to inform Plaintiff and New

York Subclass members that the Class Vehicles were designed and manufactured in such as a

way as to present an inherent safety risk, including the risk of rollaway incidents, and has failed

to remedy the defective ZF Shifter free of charge.

159.    FCA breached the express warranty promising to repair and correct a

manufacturing defect or materials or workmanship of any parts they supplied.  FCA has not yet

provided an adequate and complete remedy to the safety and usability issues presented by the

defective ZF Shifter in the Class Vehicles.

160.    Affording FCA a reasonable opportunity to cure its breach of written warranties

would be unnecessary and futile.

161.    Furthermore, the limited warranty promising to repair and/or correct a defect fails

in its essential purpose because the contractual remedy is insufficient to make Plaintiff and the

other New York Subclass members whole and because FCA has failed and/or has refused to

adequately provide an adequate and complete remedy within a reasonable time.

162.    Accordingly, recovery by Plaintiff and the other New York Subclass members is not restricted to the limited warranty promising to repair and/or correct a defect, and Plaintiff, individually and on behalf of the other New York Subclass members, seeks all remedies as allowed by law.

163.    Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered because of FCA's conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiff's and the other New York Subclass members' remedies would be insufficient to make Plaintiff and the other New York Subclass members whole.

164.    Finally, because of FCA's breach of warranty as set forth herein, Plaintiff and the other New York Subclass members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiff and the other New York Subclass members of the purchase or lease price of all Class Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

165.    FCA was provided notice of these issues by the investigations of the NHTSA, numerous complaints filed against it including the instant Complaint, and by numerous individual letters and communications sent by Plaintiff and others within a reasonable amount of time after the allegations of defects in the Class Vehicles became public.

166.    As a direct and proximate result of FCA's breach of express warranties, Plaintiff and the other New York Subclass members have been damaged in an amount to be determined at trial.

## SIXTH CAUSE OF ACTION
### Unjust Enrichment
### <u>(On behalf of the New York Subclass)</u>

167.    Plaintiff repeats and re-alleges the allegations contained above as if fully set forth herein.

168.    Plaintiff brings this cause of action on behalf of himself and the members of the New York Subclass.

169.    By its wrongful acts and omissions of material facts, FCA was unjustly enriched at the expense of Plaintiff and members of the New York Subclass.

170.    At all relevant times, FCA knew that the ZF Shifter was defective.

171.    Nevertheless, FCA continued to market and sell vehicles known to contain a defect that placed consumers and the general public in danger.

172.    As a result, FCA was unjustly enriched at the expense of Plaintiff and other members of the New York Subclass because it sold and leased at a profit defective cars whose value was artificially inflated by FCA's concealment of defects and safety risks associated with the ZF Shifter, and Plaintiff and the members of the New York Subclass have overpaid for the cars and been forced to pay other costs.

173.    It would be inequitable and unconscionable for FCA to retain the profit, benefit, and other compensation it has obtained from its fraudulent, deceptive, and misleading conduct alleged herein.

174.    By reason of the foregoing, Plaintiff and the New York Subclass are entitled to restitution and disgorgement by FCA of all monies unjustly and inequitably retained by FCA in connection with its sale of the Class Vehicles, as well as any other remedies afforded at law or in equity.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and the Classes, respectfully requests that the Court grant relief against Defendant as follows:

a.   Certifying this action as a class action, with the Classes as defined above;

b.   Appointing Plaintiff as representative of the Classes;

c.   Appointing Plaintiff's counsel as counsel for the Classes;

d.   Issuing proper notice to the Classes at Defendant's expense;

e.   Awarding compensatory damages to Plaintiff and the members of the Classes in an amount according to proof at trial;

f.   Awarding treble damages to Plaintiff and the members of the Classes in an amount according to proof at trial;

g.   Awarding statutory damages to Plaintiff and the members of the Classes;

h.   Awarding punitive damages to Plaintiff and the members of the Classes;

i.   Awarding restitution and disgorgement of Defendant's revenues or profits to Plaintiff and members of the Classes;

j.   Awarding prejudgment interest on the monies wrongfully obtained by FCA from the date of collection through the date of entry of judgment in this action;

k.   Awarding attorneys' fees, expenses, and recoverable costs reasonably incurred in connection with the commencement and prosecution of this action to Plaintiff and the members of the Classes to the extent permitted by GBL §§ 349 & 350 or other applicable law; and

l.   Awarding Plaintiff and the Classes such other and further relief as this Court deems just and proper.

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby demands a trial by jury of all issues triable by jury.

Dated:  August 8, 2016
        White Plains, New York

**FINKELSTEIN, BLANKINSHIP,
FREI-PEARSON & GARBER, LLP**

By:     s/ D. Greg Blankinship         
D. Greg Blankinship (519819)
Jeremiah Frei-Pearson (519820)
445 Hamilton Avenue, Suite 605
White Plains, New York 10601
Tel: (914) 298-3281
Fax: (914) 824-1561
gblankinship@fbfglaw.com
jfrei-pearson@fbfglaw.com

*Attorneys for Plaintiff and the Putative Classes*